Good morning. We have five cases on the calendar this morning, a trademark case, two veterans' appeals, one of which is submitted on the briefs and therefore will not be argued. We have a government contract case and a patent case, our usual wide diversity of subject matter. Our first case is In Re St. Helena Hospital, 2014-2009. Mr. Heisler. I assume it's Heisler. Yes, yes, Your Honor. Good morning, Your Honors. May I please the court? My name is Brad Heisler and I represent St. Helena Hospital in their attempt to register Take 10 as a trademark for their healthcare services, namely an inpatient residential lifestyle evaluation and improvement program. I would like to focus in on there's three factors from the DuPont case that are relevant in this particular case. I'd like to focus first on the second DuPont factor, which is the similarity or dissimilarity in nature of the goods or services that are described in an application or registration. I'd like to emphasize that this factor focuses on the description that's in the application or the registration. And so we need to look to the goods and services descriptions of the cited registration when we're evaluating this second factor. When we look at the goods and services in this case, we have one case where it is services involved, healthcare services in the form of an inpatient residential hospital-based lifestyle improvement program. In the other case, it's a particular category of printed goods. So we have a case of goods versus services. But they're both sort of health, exercise, fitness related. I would agree, Your Honor. I would agree. And what this court found in the case of Shen Manufacturing versus the Ritz Hotel is that there's really two steps to analysis when you're comparing goods and services. It's not enough merely that goods can be used with the services, but there has to be a sense of relatedness found. And this sense of relatedness is something in the evidence that would show that a consumer would be likely to confuse the goods with the services. In the Shen case, that was a case that involved a hotel that was providing cooking classes and a previous registration for goods in the form of kitchen textiles. And the trademark trial and appeal board rightly noted that you would obviously use kitchen textiles, oven mitts, hand towels, aprons in a cooking class. But that wasn't enough. There had to be a sense of relatedness shown. And they held in that case that there was not substantial evidence that there was such a sense of relatedness. Wouldn't it be normal in any sort of a health care program to have written materials or brochures or guidelines or things of that sort distributed? I would agree. And in fact, the specimen of use for St. Helena Hospital includes ten bullet points of things that are included in their program. And it includes an exercise component, but it's only one of ten different bullet points. Maybe there's one that's kind of 50-50. So maybe 20 to 30 percent, maybe 10 to 20 percent of a residential lifestyle improvement program is going to have an exercise component. But isn't that substantial evidence of some sort of relatedness? No, Your Honor. I would say that that shows that the goods are used with the services. But we have to go a step further to find a sense of relatedness. The sense of relatedness language came from the Ricotte v. Benson case. And that was the case of Frito-Lay versus Fido-Lay. And the court said we have to, even though it was goods versus goods, we have to find a sense of relatedness, something that would show confusion between dog treats on the one hand and human treats or snack foods on the other hand. And the kind of things that they looked for were that there were manufacturers that sold both types of goods. So you could have the same party providing both services and not just providing them but selling these actual services. And then they also pointed to another interesting piece of evidence, which was that the Frito-Lay company had done a co-promotion with Disney where they had put 101 donations on their Frito-Lay snack packages. And they said, you see, here's a sense of relatedness. We could see how a customer might think that Frito-Lay might decide to get into the dog treat business because here they're putting dogs on their packaging. In St. Helena, we know that you argue that St. Helena targets sophisticated consumers because of the level of expense and the nature of the activities. Did they only target adults or are children able to sign up for this program? If you look at the specimen, I would say they target adults. I don't know if they may have exceptions for children, but they're addressing the type of diabetes that you don't get as a child usually, but it's more of a lifestyle-related diabetes. Hypertension would be unusual for someone for a child to get, although possible. So I could see there would be a possibility. And I would say just a little differently, not so much that the consumers are sophisticated, although they might be, but that they're careful. And this is the third DuPont factor that looks to the sophistication or care with which the customers are exercising when they experience the marks. In this case, the customers are very careful. When you look at the specimens of use for our application, the website has lots of information because people are going to make a careful decision before they decide to make this major commitment. Basically check themselves into a hospital so that they can get their lifestyle-related illnesses fixed. And so they're exercising a high degree of care. And that's what the board actually found was that consumers would exercise a high degree of care, which is the same third DuPont factor. But then the board found that the consumers on the other side of the equation would not exercise a high degree of care. And what they found and that I would dispute is once they're in the program, they might not exercise a high degree of care when they are encountered with printed materials. And what I would say about that is that encounter, first the customer has been careful and they've seen the website information, but then they're going to spend 10 days immersed in the branding environment of the hospital, immersed in the program. They might not be that sophisticated of a consumer on day one, but by the time they come out of that program, they will have seen the Mark Take 10 the way that St. Helena uses it and they would be able to readily distinguish between a mark like that of ILSI, partly because there are differences between the marks. There's an exclamation point at the end of the ILSI goods mark and they spelled the 10, 1-0, instead of T-E-N. Those are small differences, but they are differences and they do make a distinction. In the Shen case, the marks were identical, RITS versus RITS. And also in the Coach case, Coach Services versus Triumph Learning, that was also a case of goods versus services. And the board and this court found that the marks were identical in appearance and they were identical in sound. But in that case, they found that there was a difference in the marks overall because of the connotation of the marks. I would like to drill in a little bit into this point of a sense of relatedness because we have to go one step beyond whether the goods are used with the services. We have to find the sense of relatedness and the examiner cited lots of evidence, over 70 pages of Internet evidence from hospitals and other companies that provide services that are like that of St. Helena Hospital. And what they found in that evidence, even though there was lots of evidence, I would submit that the weight of that evidence should not be measured in page count or the weight of the paper, but in the probative value. What did they actually find? Are there any instances in those 70 plus pages? We don't weigh evidence, do we? We look at whether the PTO had substantial evidence, right? That's right. And so we're looking for substantial evidence of this sense of relatedness. And there's 70 pages of evidence, but when we look at that evidence, we see that in every instance, with every page, there's one of three weaknesses in the evidence that makes it not applicable, except for there's one instance where it does not have those weaknesses. In many instances, they cite goods that are being provided by one of these health care service providers, but the goods are not the goods that are actually described in the registration. The second DuPont factor says that we have to compare the, we have to look at what is described in the application or what is described in the registration. And the goods description in this case is not just printed materials. If it was printed materials, then they would be encompassing all of class 16 and all printed materials, but they limited their registration to five specific categories of printed materials. They specifically limited it to printed manuals, posters, stickers, activity cards, and educational worksheets that deal with activity and exercise. And so when we look at this evidence, a lot of the evidence, for instance, might be directed to a newsletter. Well, a newsletter is not one of those five categories of goods. Or it might be a diary. A diary is an interesting piece of printed, it is paper goods, but a diary is usually empty and you fill it with things. So it's not really a manual, it's not a poster, it's not a sticker, it's not an activity guide, and it's not an educational worksheet. An educational worksheet would have some educational component, it wouldn't just be an empty diary. So much of the evidence cites something that's an exercise log or an exercise diary. That's not the goods that ILSI registered their mark for. Another weakness in the marks... But there are things that might arguably be characterized as educational worksheets, are they not? Educational worksheets, in my mind, call to attention something that educates and you have a filling out component. There's going to be some information and then you're going to fill in some information. There may be some things that might qualify as that, but there's weaknesses in this evidence that make it hard to evaluate that. Almost all the evidence doesn't show an actual piece of printed material, but it's a list of things that you will be provided with. So we can't actually look at the evidence and say, is this a worksheet because it's not there. There's one instance where we actually do have a piece of evidence that is related to exercise. It's on the list of five goods or services and it's related and it otherwise qualifies. And when we look at it, it's at page A116 of the appendix. It shows some diagrams of someone doing exercise and it has instructions for how to do the exercises. It's an example of where we can go beyond just showing that the goods are used with the services, but we can actually evaluate the sense of relatedness. When we look for the sense of relatedness at page A116, one thing that's conspicuously missing is this exercise guide, you might call it. It's provided by Hilton Head Health, which is an entity that provides services kind of like St. Helena Hospital. Mr. Heiss, for this case, of course, it's about take 10, you've taken 12. You can continue or we'll save the rest for you as you choose. I'll just mention about that piece of evidence. It doesn't have the trademark on the goods, and so there's nothing about that document that gives you that sense of relatedness. Thank you. Ms. Heber. Thank you, and may it please the Court. You may have 15. Thank you very much. With or without an exclamation. I don't think that matters. The two marks here, take 10, are very similar. Even Mr. Heissler comments that there's small differences between them. Small differences are not enough to render them dissimilar for purposes of the first DuPont factor. Well, they sound alike. They do sound alike, but they look different, don't they? They look a little different. One's spelled out. One has the numeral. One has an apostrophe. And the fields of use are not identical. This is true, but the fields of use are related, and the marks are overall similar. And they are comprised of... And what's the issue? Confusingly similar? Confusingly similar. Are consumers going to encounter the goods and services under conditions and circumstances in which they're going to think that these goods and services come from the same source because of the similarity of these marks? With respect to the goods, we are talking about fundamentally different things, aren't we? One is targeting children and encouraging them to get up and move for 10 minutes a day, and the other is a very sophisticated program that is trying to induce adults to spend 10 days in a high-end facility. Your Honor, respectfully, that's incorrect. You have to look at what the actual identification in this registration is. It's a registered mark. It's entitled to the presumptions under Section B of the Act for what it covers on its face. We can't read in restrictions from what might actually be shown to be in their specimen of use. All that is covered here are printed materials and worksheets that deal with physical fitness. They're not restricted to children. They are not restricted in any channels of trade or in how they're used. And, in fact, the evidence shows that printed manuals and worksheets of the type that are covered by this registration are provided as part of lifestyle, weight, and health improvement programs that are rendered in a hospital-based setting. You really need to look no further than St. Helena's own specimen to confirm that these goods and services are related in the sense that matters for likelihood of confusion purposes, and I take you to page A20 and A21, whereas they feature in here that they say with their small class sizes, you're going to get five things. You're going to get individualized attention, and now we're on page A21. You're going to get a comprehensive risk assessment. You're going to get an exercise prescription. You're going to leave with a lifestyle medicine roadmap designed specifically for you, and you're going to get a Take 10 action plan, and that includes healthy habits, exercise tips, illustrations, and instructions. You are getting a manual, if you will, that has materials that feature physical fitness in them. Consumers in that setting are going to reasonably think that these materials come from the same source as the services, and so it's that sense of relatedness that matters. It's not whether consumers are going to confuse the goods and services. It's whether they're going to encounter them in circumstances where they're going to think they come from the same source, and there's substantial evidence in the record here that shows that they do. The board found that patients considering applicant services will exercise a high degree of care, but then it went on to find that the degree of care factor is neutral. What substantial evidence supports that conclusion? Well, I think they correctly found that in a hospital-based setting, if you're going to give up a period of time, you're going to take a break, as it were, from your life for a period of time to improve your health, you're going to exercise a fair degree of care in making that decision. But when you're looking at printed materials, manuals, worksheets, activity cards, dealing with physical fitness to improve your health and fitness, you're not going to exercise that same degree of care as you would when you're making a huge investment to go live someplace else to improve your health. So you make the investment, so you use a high degree of care to make the investment, but the minute you get there, you become sloppy? I mean, that doesn't make sense. I don't think that's what the board was getting at. I think their point is that I'm there, I made this big decision, I'm here now, but now I'm getting my manuals, my notebooks, my written materials, my exercise prescription, my worksheets that I'm going to use during this program and have as a resource when I leave. Am I exercising a great degree of care when I'm looking at those printed materials? That is the point that they're making. And just because you exercise a high degree of care for St. Helena's services, it doesn't mean that you're going to exercise that same degree of care for printed materials. But what evidence is in the record that deals with this? Because clearly the board recognized, and I think we were all in agreement, that somebody signing up for a 10-day in-hospital program, they're going to exercise a high degree of care. But then to say, well, but it doesn't matter because once they get there, they'll look at materials and it'll be very casual. What supports that conclusion? I think just the identification of good does. The fact that it's just printed materials.  You're not being as careful and considered as perhaps you would be when you're looking to... No, that's a conclusion. But, you know, the materials themselves are a little different. They're, you know, posters, stickers, printed materials. A little different. The market's a little different. The consumer is still in an in-hospital setting. And to suggest that they're going to no longer exercise any high degree of care seems to me to be hard to support on that record. Well, I don't think it is, Your Honor, and maybe this will help to think about, again, because these printed materials are not restricted in the channels of trade. Consumers could encounter these and purchase these separately from when they're part of a program. I think all the Board was trying to say there was that they might be sophisticated while they're with you. They're not always sophisticated in thinking about printed materials. So here you have a situation where... But consumers looking for something like this aren't going to go on a website looking for stickers. I mean, that's a different target audience. They're not going to look for stickers. But are they going to look for manuals and worksheets and printed materials that are going to help them learn how to exercise and be more physically fit? I submit that they would. I mean, the commitment to St. Helena's program is a big one. You might start small by learning how to exercise before you're going into St. Helena's program. Let's talk about the channels of trade. You say that because both the ability to find out about St. Helena's program and sign up for it and the ability to get these Take 10 school-related materials are accessible on the Internet, that therefore, by definition, they're the same channels of trade. And that's the only channel that was discussed. Does that mean that from this day forward, channels of trade is an issue that falls out because everything today is available on the Internet? No, I don't think that's true. I think if people are going to go research things on the Internet and find things and type in the mark and they're going to come up with these two things, that's relevant. But if they're sold through the Internet and there's evidence that shows that they are, it is a relevant channel of trade. It's the only one that was discussed. So really, it's true, though, if you take this to its logical stream, that essentially unless you came up with some odd product that you couldn't access information on on the Internet, then the Board would always be able to say that it's the same channel of trade. Your Honor, I don't believe that the Board said anything about the Internet as a channel of trade. It simply said that the registered goods have to be presumed to travel on all normal channels of trade for those goods and to all normal customers, customers which include an average consumer looking to improve their health through fitness, but also include hospital-based residential programs just like St. Helena's. There's nothing that says that these programs necessarily provide and create their own printed material to deal with exercise and fitness. They could well be a customer of the printed materials here, and consumers are going to then confront these two things under circumstances in which they would absolutely think that they emanate from a similar source or are somehow connected or affiliated. There is substantial evidence to support the Board's findings on the two critical factors of the similarity of the marks and the similarity of the goods and services. So even if you disagree on the sophistication of the purchasers, that does not tip the balance in a case like this. It's not a controlling factor. And the Board, I'd remind you, found it nearly neutral. So even if it would favor them slightly, it's not enough to find that these are not confusingly similar. And so I submit the request that the Board's decision be affirmed. They have shown no error, no basis to conclude that the Board's findings were unreasonable. They're supported by substantial evidence. They should be upheld, so should its conclusion of likelihood of confusion. If you have no further questions. Thank you, Ms. Heber. Mr. Heisler has two and a half minutes rebuttal time. Thank you, Your Honors. I would like to just recite the specific standard in DuPont for the first factor in evaluating likelihood of confusion, and it's to look at the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression. What I want to emphasize there is it says to consider the marks in their entireties. So everything about the mark has to be evaluated. This is similar to the Trademark Manual of Examining Procedure, which specifically says that punctuation is presumed to be part of a mark. So there's a presumption that this exclamation point at the end of the Take 10 mark is a material part of the mark, and when we use the DuPont factor to consider the marks in their entireties, it's a factor to be considered. This argument was raised with the examiner and with the board, and both the examiner and the board never said anything about the exclamation point. What about the exclamation point in your mind has a commercial impact on the consumer? It's two things that in conjunction work together. One is when you see the mark visually, you both see the exclamation point, and if you're like me and your lips move when you read, you're kind of saying it a little differently. You're getting a different impression when you see it. You say it louder? You say it louder. With the sound, I think it's a bigger deal. When you hear Take 10 without the exclamation point, it's Take 10. When it's Take 10 with the exclamation point, it's Take 10. It has a different sound. Now, the board found that the marks were phonetically equivalent. Of course, this isn't rebuttal, is it? This is a point that wasn't raised earlier. True enough. Would you like to hear more about it? I don't want to. No, not without Kelly having a chance to respond. I would just like to close then with a final, I think the closest case from our precedents, from the precedents of this court, is the Shen case. In the Shen case, the court found that there was no sense of relatedness, even though kitchen textiles are used in a cooking class. In the Shen case, there was no finding that the consumers were sophisticated or careful. The marks were considered to be identical. In this case, we have marks that can be distinguished, and we have careful customers. We do have goods that can be used with the services, but we don't have this sense of relatedness that shows that there's a likelihood of confusion. Thank you. Thank you. Mr. Hyslop will take the case under advisement.